# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 07-3850 |
| 4326 KURZ, LTD., d/b/a PITCHERS PUB, | : | |
| a/k/a PITCHER'S PUB et al., | : | |
| Defendants. | : | |
| | : | |

## Memorandum

YOHN, J.                                                                    June 30, 2009

Plaintiff, J&J Sports Productions ("J&J"), brings this action against defendants, 4326

Kurz Ltd., Jeff Kurz, and Melissa Kurz, for violations of the Communications Act of 1934

("Communications Act"), 47 U.S.C. §§ 151, *et seq.* (2006), arising out of defendants' alleged

showing of a June 9, 2007 televised boxing match, to which plaintiff had exclusive nationwide

distribution rights for commercial establishments.  Presently before the court are plaintiff's and

defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For

the reasons set forth below, the court will deny both motions because there exists a genuine issue

of material fact that makes judgment as a matter of law inappropriate for either party.

## I.       Factual and Procedural Background

J&J is a distributor of viewing rights to pay-per-view sporting events for commercial

entities, such as sports bars.  (Pl.'s Mem. of Law Support of Mot. Summ. J., Aff. of Joseph

Gagliardi ("JG Aff.") ¶ 8, at 2.)  Defendant 4326 Kurz Ltd. is a Pennsylvania corporation that

does business as a bar and restaurant called Pitcher's Pub or Pitchers Pub.  (Pl.'s Statement of

Material Facts ("PSOMF") ¶¶ 2-3.)[1]  Pitcher's Pub occupies the first floor of the building at 4326

Main Street, Philadelphia, Pennsylvania, although in the two floors above there are at least two

apartments.  (JG Aff, Ex. B, Affidavit of Jonathan DiBello ("DiBello Aff.") at 1.)  Plaintiff

asserts, and defendants do not contest, that at the time of the incident giving rise to this litigation,

defendants Jeff and Melissa Kurz served in some capacity as officers, directors, shareholders, or

principals of 4326 Kurz Ltd.  (PSOMF ¶ 5.)[2]  Both Jeff and Melissa had supervisory capacity and

---

[1]  On October 30, 2008, the court issued a scheduling order that instructed both parties, inter alia, to accompany any motion for summary judgment with "a separate, short and concise statement, in numbered paragraphs, of the material facts to which the party contends there is no genuine issue to be tried."  Scheduling Order, *J&J Sports Prod., Inc. v. 4326 Kurz, Ltd.*, No. 07cv3850, ¶ 7, at 2 (E.D. Pa. Oct. 10, 2008).  Furthermore, the court ordered that the "opposing party shall file a separate, short and concise statement, responding to the numbered paragraphs in the moving party's statement, of the material facts as to which the opposing party contends . . . a genuine issue [exists]."  (*Id.*)  In these statements, both parties must "support each [fact] with specific citations to the underlying record."  (*Id.*)  The facts asserted "by the moving party shall be deemed admitted unless controverted by the [opposing party's] statement."  (*Id.*)

Plaintiff filed the required statement of facts.  Defendants' statement in response fails to include citations to the record in several places.  (Defs.' Resp. to Pl.'s Statement of Material Facts ("DRSOMF") ¶¶ 1, 4, 5, 6, 7, 8, 9, 13, 14.)  Moreover, defendants responded to some of plaintiff's assertions of fact with the statement, "Neither admitted nor denied."  (*See, e.g.*, 1, 4, 6, 8.)  Because this statement does not "controvert" plaintiff's factual statement, the court deems admitted those facts about which defendants so equivocate.

[2]  In its statement of facts, plaintiff asserts that Jeff and Melissa Kurz *acted* as officers, directors, shareholders, or principals of Pitcher's Pub on the night of the fight.  In response to plaintiff's statement of facts, defendants state, without citation to the record, that "Jeff Kurz *is* not an officer, agent, shareholder, partner, etc. of 4326 Kurz, Ltd."  (DRSOMF ¶ 5 (emphasis added).)  Defendants make no statement as to Jeff Kurz's role on June 9, 2007 and thus do not contest that Jeff Kurz *was* an officer of 4326 Kurz, Ltd., on the day of the event giving rise to this litigation.  Moreover, in their answer to plaintiff's complaint, defendants stated that "Defendants, Jeff Kurz and Melissa Kurz are believed to be principals of 4326 Kurz, Ltd.," (Defs.' Answer to Pl.'s Am. Compl. and Affirmative Defenses ("Defs.' Answer") ¶ 9), a most unusual and clearly obfuscating statement by parties who should know what their own official capacities for the corporation are.

control over Pitcher's Pub on the night of June 9, 2007.  (PSOMF ¶ 11.)[3]

Through an agreement with a promoter of boxing matches, Top Rank, Inc. ("TR"), plaintiff obtained an exclusive license to distribute TR's televised communication of the June 9, 2007 fight between Miguel Cotto and Zab Judah ("the fight").  The agreement granted plaintiff a license to distribute the broadcast throughout the entire United States, but only to commercial establishments—including bars, restaurants, and the like.  (PSOMF ¶ 4; JG Aff. ¶ 3 & Ex. A, License Agreement ("Lic. Agreement") at 1.)  Under the agreement with TR, plaintiff would receive transmission of the fight from TR via satellite and then distribute the broadcast to commercial establishments, usually through a satellite television provider, such as DirecTV.  (Lic. Agreement ¶¶ 3-4; Pl.'s Mem. of Law Support of Mot. Summ. J., Aff. of Kent Mader ("Mader Aff.") ¶ 7.)  In return, plaintiff would receive a fee from each commercial establishment receiving the fight.  Several establishments in Pennsylvania made such arrangements with plaintiff.  (JG Aff. ¶¶ 4-5.)  Defendants, however, did not purchase the right to receive

---

[3]  Both the complaint and plaintiff's statement of facts state, "Jeff Kurz and Melissa Kurz, were the individuals with supervisory capacity and control over the activities occurring within the establishment on June 9, 2007."  (PSOMF ¶ 11; Pl.'s Compl. ¶ 10.)  In their answer, defendants denied the allegation, but stated that "Jeff Kurz was the only individual with supervisory capacity and [sic] any time as referenced by plaintiff's complaint."  (Defs.' Answer ¶ 10.)  Defendants also admit that Melissa Kurz is the president of 4326 Kurz Ltd. and, therefore, presumably has supervisory capacity over it.  (DRSOMF ¶ 5.)

In response to plaintiff's statement of facts, defendants cite the complaint and state that "Jeff Kurz is not an officer, shareholder, etc. of 4326 Kurz, Ltd." and that "neither Mr. Kurz nor Ms. Kurz were [sic] present the evening of the fight in question."  Because defendants do not contest the supervisory capacity of Jeff Kurz and Melissa Kurz over Pitcher's Pub on June 9, 2007, but rather only their presence there, the court deems admitted, for the purposes of this motion, that the Kurz's had supervisory capacity of Pitcher's Pub on that date.

The record on these issues is regrettably murky.  Presumably at trial plaintiff will more precisely prove such issues as the official capacities of Jeff and Melissa Kurz with 4326 Kurx Ltd., the basis for their individual liability, if any, and the relationship of 4326 Kurz Ltd. and Pitcher's Pub.

transmission of the fight from plaintiff.  (JG Aff. ¶ 5.)

On or before June 9, 2007, the night of the fight, plaintiff generated a list of commercial establishments that did purchase rights to receive and exhibit the fight.  (PSOMF ¶¶ 6-7; JG Aff. ¶ 12; JG Aff., Ex. C, List of Nationwide Establishments that Paid for Cotto/Juddah Fight.) Plaintiff hired auditors to visit—on the night of the fight—selected commercial establishments in Philadelphia not on that list.  (*Id.*)  Plaintiff instructed the auditors to observe whether these establishments were showing the fight.  (*Id.*)  At about 11:05 p.m., one of these auditors visited Pitcher's Pub, which was not on plaintiff's list of establishments that paid for the fight.  (DiBello Aff. at 1.)  Inside Pitcher's Pub, the auditor observed the fight being displayed on one of the four televisions in the establishment, which was open and had patrons.  (*Id.*)  The auditor's observation included the bartender operating a television remote control, a DirecTV menu appearing on the screen of one television in the bar, and the television's image switching from a baseball game to the fight.  (*Id.*)  The auditor saw the first three rounds of the fight and took pictures of a television as it displayed the fight.  (*Id.*)  The auditor did not observe a cable box anywhere in Pitcher's Pub, but also did not observe a satellite dish.  (*Id.*)  The auditor found the bar crowded and estimated the establishment had a capacity of 25 people, but that over 60 people were in the bar during his visit.  (*Id.* at 2.)

At the time the auditor made these observations, Jeff Kurz had an active account with DirecTV for satellite television services at the address 4326 Main Street, Philadelphia, the same street address as Pitcher's Pub, although the records do not indicate a specific floor at that address.  (Pl.'s Mem. of Law Support of Mot. Summ. J., Affirmation of Wayne Lonstein ("Lonstein Affirmation"), Ex. A, DirecTV Records ("DirecTV Records").)  DirecTV also has

records that Pitcher's Pub had an account for the address 4326 Main Street, but the account was inactive on the date of the fight.  (DirecTV Records.)  The parties dispute whether Jeff had a business or residential account with DirecTV.[4]  Regardless of the type of account Jeff had, he did use this account to purchase a pay-per-view broadcast of the fight on June 9, 2007 for $44.95, the residential rate.  (DirecTV Records; DSOMF ¶ 12.)

According to DirecTV's standard residential contract, DirecTV "provides digital satellite entertainment programming and services."  (Lonstein Affirmation, Ex. A, DirecTV Customer Agreement ("DirecTV Cust. Agmt.") at 1.)  Furthermore, the contract limits service to "private non-commercial use" and prohibits viewing programming "in areas open to the public or in commercial establishments."  (DirecTV Cust. Agmt. ¶ 1(h); DSOMF ¶ 18.).  Under the contract, DirecTV "or any programming provider may prosecute violations of the foregoing against you [customer] or other responsible parties."  (DirecTV Cust. Agmt. ¶ 1(h).)

Plaintiff had an arrangement with DirecTV such that if any DirecTV commercial customer sought to order or receive the fight from DirecTV, DirecTV would have sent that customer to J&J.  (JG Aff. ¶ 16; Mader Aff. ¶ 7.)  Nevertheless, according to DirecTV Senior Director of Fraud Management, it was possible for a commercial establishment to set up a residential account with DirecTV, pay residential rates for DirecTV services, but use the account in a commercial setting.  (Mader Aff. ¶ 5.)

---

[4]  DirecTV's records for Kurz's account include the entry "COMMERCIAL DIRECT ACQ" under the title "Created By Dealer" and the entry "COMML HOUSE ACCOUNT" under the title "Chain Number/Name."  (*Id.*)  Under the title "Id 1," the records includes this statement, "THIS IS A BUSINESS!!!!!"  (*Id.*)  Finally, in a section titled "Comments," the records contain an entry for September 1, 2007 entitled "FRAUDULENT ACCESS" and a notation that "BOB . . . CALLED TO FLAG THIS ACCOUNT WHICH HE STATED IS A BUSINESS SET UP AS A RESIDENTIAL."  (*Id.*)

Plaintiff's agreement with TR included provisions about assertions of claims of piracy. Specifically, the agreement stated that "TR and [plaintiff], acting jointly, shall have the right to commence or settle any claim arising out of the alleged piracy, use[,] or proposed use of the telecast" anywhere in the United States.  (Licensing Agreement ¶ 6; DSOMF ¶ 14.)  Further, the parties agreed to "notify each other in writing and shall consult with each other and mutually agree before commencing or settling any [piracy] claim or litigation in the territory."  (Licensing Agreement ¶ 6; DSOMF ¶ 15.)  TR is not a party to this lawsuit.

Plaintiff filed the initial complaint on September 13, 2007, followed by an amended complaint filed February 6, 2008.  Plaintiff brings three counts, each for violation of a separate provision of the Communications Act: § 605(a) (Count I), § 605(e)(4) (Count II), and § 553 (Count III).  On October 17, 2008, the court dismissed Count II[5] and held that plaintiff could plead violations of § 605(a) and § 553 alternatively, but could eventually only recover under one of those sections, not both.  Defendants answered the amended complaint on November 10, 2008.  Plaintiff filed its motion for summary judgment on December 16, 2008.  Defendants responded and plaintiff replied.  On January 16, 2009, defendants filed their cross-motion for summary judgment, for which their supporting memorandum sets forth arguments almost identical to their response to plaintiff's motion.[6]  Plaintiff responded.

_____

[5]  The court dismissed the count without prejudice to file a second amended complaint, but plaintiff did not do so.

[6]  In fact, defendants memorandum supporting their motion for summary judgment replicates verbatim their memorandum supporting their opposition to plaintiff's motion for summary judgment, but for the addition of four sentences, the deletion of two others, and a few other minor alterations.  Accordingly, the court will address defendants' cross-motion simultaneously with plaintiff's motion.

II.      **Standard of Review**

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party may not rely merely on bare assertions, conclusory allegations, or suspicions, *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), but instead must present "specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)). "If the [nonmoving] party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

"Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted). For elements on which the nonmoving party bears the burden of production, the party must show more than "[t]he mere existence of a scintilla of evidence," but instead must present concrete evidence supporting each essential element of its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322-23. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at

-7-

587 (citations omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed." *Anderson*, 477 U.S. at 255.  Furthermore, "[a]ll justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.*  "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citation omitted).  Where, as here, the parties have filed cross-motions for summary judgment, "Rule 56(c) does not mean that the case will necessarily be resolved at the summary judgment stage . . . Each party must still establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Atl. Used Auto Parts v. City of Phila.*, 957 F. Supp. 622, 626 (E.D. Pa. 1997).

## III.   Discussion

The parties dispute whether: (1) § 605(a) or § 553 applies to this action; (2) a violation of either section occurred; and (3) plaintiff has standing to bring a cause of action for any violation of the Communications Act in light of its contract with TR.  As further explained below, the court finds that there remains a genuine issue of material fact; therefore, neither party is entitled to judgment as a matter of law.

### A.   Applicability of § 605(a)

In light of the court's disposition of defendants' motion to dismiss, plaintiff has elected to pursue a claim under § 605(a), arguing that the alleged unlawful communication at issue

occurred via satellite transmission, to which only § 605(a) applies.  Defendants argue that

plaintiff presents "no real analysis" of § 605(a)'s applicability and further appear to argue that if

they did receive and exhibit the fight, they did so through a "residential cable box" and therefore

section 605(a) can not apply, but § 553 does.[7]

> Section 605(a) provides that:

>> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or *radio* shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, [to unauthorized persons].  No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.  No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a) (emphasis added).  Conversely, § 553 prohibits "intercepting or receiving any

communications service offered over a *cable* system, unless specifically authorized to do so by a

cable operator or as may otherwise be specifically authorized by law."  *Id.* § 553(a)(1) (emphasis

added).  Under the Communications Act, "[t]he term 'radio communication' or 'communication

by radio' means the transmission by radio of writing, signs, signals, pictures, and sounds of all

---

[7] Defendants' brief states, "assuming, arguendo, Jeff Kurz had a residential satellite cable subscription with DirecTV, and the fight was shown at Pitcher's Pub and individuals at the establishment viewed the event, and the residential cablebox was used to show the fight, . . . § 605 is inapplicable . . . because [it] does not apply to interception of cable signals."  (Defs. [sic], 4326 Kurz Ltd. a/k/a Pitcher's Pub, Jeff Kurz and Melissa Kurz Mem. of Law Opp'n Pl.'s Mot. Summ. J. ("Defs.' Resp.") at 9.)  The logic of this argument escapes the court, absent evidence as to defendants' explanation of precisely what they consider a "residential cable box."  Perhaps defendants should state specifically what mechanism they used to broadcast the fight so that the plaintiff and the court will not have to waste resources dealing with alternative claims.

kinds, including *all instrumentalities*, facilities, apparatus, and services (among other things, the

receipt, forwarding, and delivery of communications) *incidental* to such transmission."   *Id.* §

153(33) (emphasis added).  The "term 'cable system' means a facility, consisting of a set of

closed transmission paths and associated signal generation, reception, and control equipment that

is designed to provide cable service [video and other programming] . . . to multiple subscribers

within a community."  *Id.* § 522(7).

    In *TKR Cable Co. v. Cable City Corp.*, the Third Circuit delineated the scope of both §

605(a) and § 553 to resolve whether § 605 applies to the use of cable signal descramblers.[8]  267

F.3d 196, 197 (3d Cir. 2001).  The Third Circuit determined that amendments to the

Communications Act in 1968 left § 605(a) with authority over "primarily . . . radio

communications," *id.* at 201, and "rendered § 605 applicable only to satellite transmissions

insofar as they are actual airborne transmissions," *id.* at 205.  Thus, the court concluded that

605(a)

> encompasses the interception of satellite transmissions to the extent
> reception or interception occurs prior to or not in connection with,
> distribution of the service over a cable system, and no more.  Once a
> satellite transmission reaches a cable system's wire distribution
> phase, it is subject to § 553 and is no longer within the purview of §

---

[8]  In transmitting cable television signals to a subscriber, cable television providers often "scramble" the signals so that, unless altered, the signals produce on the viewer's screen a distorted image, unsuitable for viewing.  These providers give to each paying subscriber a cable box, or other descrambling device that receives the incoming signals, descrambles signals for those channels the subscriber paid, and transmits them to the subscriber's television, producing a clear image.  In this way, providers prevent unauthorized viewers from receiving cable television services without paying.  A unauthorized descrambler circumvents this security measure by allowing a non-subscriber or partial subscriber to receive scrambled signals, but transmit to a television unscrambled signals and obtain a clear picture for unauthorized channels.  *See TKR*, 267 F.3d at 197 (discussing how cable provider encodes signals to prevent individuals from receiving signals not paid for and how descrambling devices enable cable piracy).

605.

*Id.* at 207 (citation and quotation omitted).  Moreover, because radio communication includes apparatus "incidental" to transmission, the "wires that connect a home satellite dish to the living room television arguably constitute facilities incidental to the transmission."  *Id.* at 202. Therefore, where a party claims another made an unlawful interception or distribution of a signal originated, transmitted, and received by satellite, the party can recover only under § 605(a).  *See Kingvision Pay-Per-View Ltd. v. Wise*, No. Civ.A. 05-4140 DMC, 2006 WL 91300, at *2 (D.N.J. Jan. 13, 2006) (applying § 605(a) where defendant used satellite dish to receive unlawfully a telecast originated and transmitted by satellite); *see also J&J Sports Prods., Inc. v. Munguti*, No. 06-1282, 2007 WL 928479, at *1-*2  (D.N.J. Mar. 27, 2007) (noting that point of interception of signal—from midair or cable system—determines applicable statutory section, either § 605(a) or § 553).

Here, the record shows that § 605(a) applies to defendants' reception and exhibition of the fight, if they did so in the manner as plaintiff claims.  Defendant Kurz had an active residential DirecTV account on the day of the fight.  The address for that account was the same as Pitcher's Pub's address—4326 Main Street.  DirecTV provides satellite transmission of programming, and for its residential subscribers it provided pay-per-view access to the fight. Records of Kurz's residential account show that Kurz ordered the fight.  Plaintiff's auditor witnessed a television in Pitcher's Pub showing the fight.  The auditor also noticed a DirecTV menu on the screen of the television that displayed the fight, shortly before the fight appeared on the screen.  Finally, DirecTV knew that customers, such as Kurz, could potentially use their residential accounts for business purposes, such as showing a fight ordered via a residential

-11-

account to Pitcher's Pub's customers.  Based on these facts, the court finds that plaintiff has met

its initial burden, as the moving party, to show that no genuine issue of material facts exists as to

whether defendants obtained the fight via satellite.

To counter the above factual support for the applicability of § 605(a), defendants do not

come forward with specific facts, but instead argue that § 553 should apply based on an

assumption and an assertion.  First, defendants rely on the assumption, without submitting their

own affidavits as to the actual facts, that they used a residential cable box to show the fight.

Nevertheless, defendants fail to specify whether the term "residential cable box" refers to the

receiver DirecTV provides to subscribers to receive satellite transmissions or a piece of

equipment for transmitting television programming from a "cable system," a fact they obviously

know, to a television.  If the former, such equipment constitutes apparatus incidental to

transmission of a satellite signal and does not render 605(a) inapplicable.  *See* 47 U.S.C. §

153(33).  If the latter, defendants provide no evidence that they received the fight over a cable

system.  Because defendants do not come forward with specific facts showing that they used a

residential cable box from a cable system, their mere assumption that they did so amounts to

conjecture and speculation, neither of which can raise a genuine issue of material fact that § 605

does not apply.  Their effort to obfuscate the issue in this manner is a waste of the court's time

and the parties' money.

Second, defendants rely on the assertion that plaintiff has provided neither facts showing

that defendants used a satellite system to exhibit the fight nor an analysis showing why § 605(a)

should apply.  As explained above, however, plaintiff has made an initial factual showing that

defendants' piracy occurred via satellite communication.  Instead of coming forward with

-12-

specific facts to rebut plaintiff's initial showing, as they must to oppose successfully a motion for summary judgment, defendants rest on this bare assertion of plaintiff's factual insufficiency,[9] which they can not use to raise a genuine issue of material fact.  *Cf. Joe Hand Promotions, Inc. v. Rennard St. Enters., Inc.*, No. 96-3593, 1998 WL 328316, at *4 (E.D. Pa. June 19, 1998) (finding § 605(a) inapplicable because of plaintiff's lack of "any affirmative evidence concerning the defendants' use of a satellite transmission").  Therefore, based on plaintiff's evidence and the absence of evidence from defendants, the court finds that no genuine issue of material fact exists for the purposes of this motion as to whether defendants received the transmission of the fight at Pitcher's Pub via DirecTV, a satellite service, which § 605 governs.  Moreover, because defendants support their motion for summary judgment with the exact same argument used to oppose plaintiff's motion, defendants, as movants, have failed to meet their burden to show that no genuine issue of material fact exists as to the applicability of § 553.  As a result, for the purposes of summary judgment plaintiff has established that § 605(a) applies to defendants' conduct and defendants have not established that § 553 does.

> **B.**   **Violation of § 605(a)**

Plaintiff argues that defendants violated § 605(a) by making an unauthorized publication of a satellite communication when defendants ordered the fight through Kurz's residential account, but showed the transmission to patrons in Pitcher's Pub for commercial purposes.

---

[9]  In fact, defendants give a fairly good analysis as to why § 605 should apply:
> Kurz ordered the boxing event through his residential *satellite* account with DirecTV, paid the residential rate[,] and exhibited the event at a commercial establishment.

(Defs.' Resp. at 11.)

Defendants do not expressly contest that a violation of § 605(a) occurred, but do point to evidence that suggests that Jeff Kurz had a commercial account with DirecTV and used that account to show the fight in Pitcher's Pub.

Under § 605(a), "no person receiving . . . any interstate . . . communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception [and to authorized persons]." Thus, this subsection "prohibits intermediaries who are authorized to receive a communication by wire or radio from divulging the contents of the transmission to any person other than the addressee intended by the sender." *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 913 (6th Cir. 2001); *see also Directv, Inc. v. Asher*, No. Civ.A. 03-1969, 2006 WL 680533, at *2 (D.N.J. Mar. 14, 2006) (finding that receiving satellite communication and publishing it to someone other than addressee constitutes violation of § 605(a)); *That's Entertainment, Inc. v. J.P.T., Inc.*, 843 F. Supp. 995, 999 (D. Md. 1993) (noting that "the first . . . sentence[] of [§ 605(a)] . . . clearly proscribe[s] the unauthorized divulgence or use of communications which have been 'received' legally for certain purposes" (quoting 47 U.S.C. § 605(a))).

Here, plaintiff presents evidence that defendants violated § 605(a)'s prohibition against divulging transmission of a satellite communication to unauthorized persons, even after lawfully receiving the communication. As explained above, the record confirms that Kurz ordered the fight on his residential DirecTV account and the fight was exhibited to patrons of Pitcher's Pub. Consequently, defendants received an interstate communication by radio, subject to 605(a)'s limitations about unauthorized recipients. Under Kurz's contract with DirecTV, Kurz could only

-14-

use this DirecTV programming for "private non-commercial use" and could not view, and

therefore show, programming "in areas open to the public or in commercial establishments."

(DirecTV Cust. Agr. ¶ 1(h).)  Furthermore, as a matter of policy, DirecTV directed its

commercial customers who wanted to receive the fight to plaintiff.  Consequently, under the

terms of his DirecTV account, in no way could Kurz have permissibly shown the fight to patrons

of Pitcher's Pub.  Therefore, the patrons constituted unauthorized recipients of the transmission

of the fight for the purposes of § 605(a), if the residential signal was forwarded to Pitcher's Pub.

       Nevertheless, according to the affidavit of plaintiff's auditor, a television in Pitcher's Pub

did show the fight to patrons, who could, and did, view the fight.  Defendants do not dispute the

observations in this affidavit or present facts to the contrary that, if they exist, are obviously in

their possession.  Instead, defendants point to documents from DirecTV that, according to

defendants, suggest they had a business account, and therefore suggest they had the right to

exhibit the fight in Pitcher's Pub.  Defendants fail to show that those records contain information

about the status of the account on the particular day defendants received the fight.  Moreover,

Jeff Kurz paid the residential rate for the fight, further undermining any claim that defendants

exhibited the fight using a commercial DirecTV account or even had such an account.

Consequently, there exists no genuine issue of material fact for the purposes of this motion that,

although Kurz had authorization to receive the fight at Pitcher's Pub's address, defendants

divulged the fight to unauthorized persons in violation of § 605(a).  *See Joe Hand Promotions v.*

*Burg's Lounge*, 2 F. Supp. 2d 710, 713 (E.D. Pa. 1998) (finding bar violated § 605(a) for

divulging transmission of boxing match to bar patrons based on uncontested affidavit from

private investigator); *Kingvision Pay Per View, Ltd. v. Williams*, 1 F. Supp. 2d 1481, 1484 (S.D.

Ga. 1998) (finding that lawfully purchasing telecast of event on a pay-per-view basis does not

relieve liability where purchaser exhibits event to patrons of purchaser's business establishment).

**C.      Plaintiff's Standing to Bring Action for Violation of 605(a)**

Defendants argue that plaintiff lacks standing to bring a cause of action against them for

three reasons: (1) plaintiff does not qualify as a "person aggrieved" who can sue under § 605; (2)

plaintiff can not pursue a cause of action individually under its contract with TR; and (3)

defendants only breached their contract with, and thus only injured, DirecTV.  Plaintiff argues

that it has standing under § 605 because it has a proprietary interest in the communication at

issue and its contract with TR does not require the parties to pursue all litigation jointly.

Before a party may bring a claim to court, the party must have standing to do so.  *Warth v.*

*Seldin*, 422 U.S. 490, 498 (1975) ("[T]he question of standing is whether the litigant is entitled to

have the court decide the merits of the dispute or of particular issues.").  There are two varieties

of standing restrictions: constitutional and prudential.  *Id.*  The parties do not contest

constitutional standing, and even if they had, plaintiff would prevail on this issue.[10]  Prudential

standing requirements—"judicially self-imposed limits on the exercise of federal jurisdiction,"

*Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal quotation omitted)—"limit access to the

_____

[10]    The constitutional standing inquiry arises out of the case or controversy requirement of U.S. Const. art. III § 2.  A litigant must demonstrate that: (1) it has suffered an injury in fact, which means an injury that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is "fairly traceable" to the defendants' conduct; and (3) the relief sought will likely redress the injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Here, because as shown above, defendants improperly used a residential DirecTV account to exhibit the fight, instead of purchasing the right to do so from plaintiff, plaintiff suffered a loss of revenue, a concrete and actual injury, which defendants' conduct caused.  Of course, the court can redress this injury by awarding damages in the amount of the lost revenue.  Having met the appropriate requirements, plaintiff has constitutional standing to sue.

federal courts to those litigants best suited to assert a particular claim," *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 179 (3d Cir. 2001), and "unlike their constitutional counterparts, they can be modified or abrogated by Congress," *Bennett*, 520 U.S. at 162.  Indeed, Congress has made just such a modification of prudential standing requirements for cases brought under the Communications Act; therefore, the court need not address prudential standing, but must determine whether plaintiff has statutory standing under § 605.

### 1.      Statutory standing

Under § 605(e)(3)(A), "[a]ny person aggrieved by any violation of subsection (a) of this section . . . may bring a civil action in a United States district court or in any other court of competent jurisdiction."  The statute further provides that the term "'any person aggrieved' shall include any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming."  47 U.S.C. § 605(d)(6).  Nevertheless, by "use of the word 'include' in the statutory phrase 'any person aggrieved shall include any person . . . ,' [the statute] does not mean that only persons who meet that definition have standing to sue." *Eliadis*, 253 F.3d at 912.  In fact, when Congress amended § 605 in 1988, it expressed that it intended the amendments to expand standing to sue.  *Id.*  Moreover, "[h]istory associates the word 'aggrieved' with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998); *see also Joe Hand Promotions Inc. v. Rennard St. Enters.*, 975 F. Supp. 746, 753 (E.D. Pa. 1997) (explaining that when Congress confers standing through "person aggrieved" statute, it permits "plaintiff to act as a private attorney general" (internal quotation omitted)).

Therefore, § 605(d)(6)'s "explicit reference to a subset of persons aggrieved was not intended to exclude others [outside of the reference] who sustain injuries from a violation of any of the prohibitions originally listed in § 605(a)." *Eliadis*, 253 F.3d at 913.  As a result, courts have found that distributors of satellite programming have proprietary rights to communications they distribute and therefore have standing to sue when others injure those rights by violating § 605.  *See Showtime/The Movie Channel, Inc. v. Covered Bridge Condominium Ass'n*, 881 F.2d 983, 985-86 (11th Cir. 1989) (finding satellite program distributor had proprietary interest in communication and therefore standing to sue), *vacated*, 895 F.2d 711 (11th Cir. 1990) (noting parties failed to notify court of settlement before prior opinion published); *Rennard St. Enters.*, 975 F. Supp. at 753 (finding plaintiff constituted "aggrieved person for purposes of [§] 605, because it has a propriet[ar]y right to the distribution of . . . broadcast" from original broadcaster); *see also Garden City Boxing Club, Inc. v. Hernandez*, No. 04 Civ. 2081(LAP), slip op. at 7, 2008 WL 4974583, at *3 (S.D.N.Y. Nov. 24, 2008) (finding that distributor of televised boxing match to commercial entities had proprietary interest in communication to qualify as person aggrieved and therefore had standing to sue); *J & J Sports Prods., Inc. v. Kamal*, No. 06 Civ. 13022(BSJ)(FM), slip op. at 6, 2008 WL 4921353, at *2 (S.D.N.Y. Nov. 18, 2008) (same). Satellite programming distributors, such as plaintiff, suffer injury when another receives a communication, to which the distributor has exclusive rights, with authorization from the sender, but divulges it to unauthorized recipients.  *See Eliadis*, 253 F.3d at 913.

Here, plaintiff has statutory standing to sue.  Under its agreement with TR, plaintiff obtained an "exclusive license to exhibit" the fight to commercial establishments throughout the United States, (License Agreement at 1), and as a result had a proprietary right to the

communication.  Under § 605, this proprietary right included both the transmission and content

of the communication.  *See Goldman v. United States*, 316 U.S. 129, 133 (1942) ("What is

protected [under § 605] is the message itself throughout the course of its transmission by the

instrumentality or agency of transmission."), *overruled on other grounds by Katz v. United

States*, 389 U.S. 347 (1967); *Eliadis*, 253 F.3d at 915 (holding that § 605 protects both

transmission and its contents).  Because plaintiff had a proprietary right in the communication,

plaintiff qualifies as a person aggrieved.  As discussed above, even though defendants did not

intercept the communication at issue, defendants violated § 605 when they exhibited the fight, to

which plaintiff had a proprietary right, to unauthorized viewers.  Defendants offer no specific

facts to contest that plaintiff had exclusive distribution rights or that defendants exhibited the

fight to patrons of Pitcher's Pub.  As a result, no genuine issue of material fact exists as to

whether plaintiff had a proprietary right in the communication of the fight and whether plaintiff

qualifies as a person aggrieved under § 605 and thus has statutory standing.

### 2.      Contractual limitations on standing

Defendants also contend that the very licensing agreement that gave plaintiff a proprietary

right to the communication of the fight also denies plaintiff standing to bring this claim.

Essentially, defendants argue that to have standing to sue, a party must comply with contractual

limitations about pursuing a cause of action, where that action arises out of rights granted by the

contract.  Courts have found that generally speaking, where plaintiff's status as a person

aggrieved under § 605 arises out of a proprietary right granted by contract and that contract

further limits plaintiff's right to sue, the court can not find standing if plaintiff brings its cause of

action in breach of those contractual limitations.  *See Joe Hand Promotions, Inc. v. Conroy*, 167

F. Supp. 2d 536, 539 (N.D.N.Y. 2001); *Nat'l Satellite Sports, Inc. v. Marzullo*, No. 96 C 6621, 1998 WL 526570, at *4 (N.D. Ill. Aug. 17, 1998).

In *National Satellite Sports, Inc. v. Marzullo*, plaintiff, a satellite programming distributor with exclusive distribution rights to a boxing match, sued a commercial establishment that intercepted and exhibited the match without paying plaintiff or receiving plaintiff's authorization. 1998 WL 526570, at *1. In granting defendant's motion for summary judgment, the district court held that although plaintiff constituted a person aggrieved under § 605, plaintiff still lacked standing because plaintiff "expressly contracted away its statutory right to sue . . . [as its licensing] agreement explicitly forbade [plaintiff] from bringing piracy suits." *Id.* at *4. In *Joe Hand Promotions, Inc. v. Conroy*, plaintiff, a distributor of satellite programming with exclusive, region-specific distribution rights to a boxing match, sued commercial establishments that exhibited the match in violation of § 605. 167 F. Supp. 2d at 537. The district court found that plaintiff's licensing agreement for the match "convey[ed] to plaintiff a right to prosecute all commercial infringers *located within its exclusive territory*," *id.* at 538 (emphasis added), i.e. where it had the right to distribute the fight. As a result of plaintiff's geographically limited distribution right, the court held that plaintiff lacked "the right to prosecute claims against commercial infringers," *id.* at 539, such as defendants, who were not located in plaintiff's exclusive territory, *id.*

Like the parties in *Marzullo* and *Conroy*, the parties here dispute whether plaintiff lacks standing for failure to comply with conditions set in its agreement with TR. The court finds the dispute entails two specific issues: (1) whether the contract requires plaintiff to join TR as a party for any action to recover damages based on a piracy claim; and (2) whether plaintiff complied

with the contractual limitations on its standing.

### a.    Interpretation of plaintiff's agreement with TR

Under plaintiff's agreement with TR, "TR and [plaintiff], acting jointly, shall have the right to commence or settle" piracy claims "arising out of the broadcast of the fight."  Of course, defendants interpret this provision as requiring plaintiff to join TR as a co-plaintiff to any piracy claim filed and further argue that because plaintiff has not included TR in this lawsuit, plaintiff lacks standing.  On the other hand, plaintiff maintains that the agreement imposes no such requirement and plaintiff has standing to sue despite not having joined TR as a party.  As no factual dispute exists that TR is not a party to this action, the court need only interpret this provision to determine whether plaintiff has standing.

Typically, the interpretation of contractual language falls under the scope of state law, even where the court has federal question subject matter jurisdiction.  *See Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 892 (3d Cir. 1975) (finding state law applicable to interpretation of general release as to its preclusion of releasor's right to bring antitrust action); *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 308 n.22 (E.D. Pa. 2000) (explaining that "validity of contracts is typically governed by state law," even in case involving federal claims (citing *Three Rivers*, 522 F.2d 885)).  Initially, it appears there remains an issue as to *which* state law applies, specifically that of: Pennsylvania, where the piracy occurred; California, where plaintiff is incorporated; or Nevada, where TR resides.[11]  The court,

---

[11]   Moreover, the contract does not contain a choice of law provision that would establish the applicable state law.  *See United States v. R.J. Reynolds Tobacco Co.*, 416 F. Supp. 316, 326 (D.N.J. 1976) (interpreting agreement using Delaware law, as agreement provided, to determine whether agreement violated federal antitrust law).  Nor does this case resemble those where the law of that particular state clearly controls because the parties reside, the contract was created,

however, need not engage in any choice of law analysis because, as more fully explained below,

all three states apply similar principles of contract interpretation and, therefore, the choice of law

will have no effect on the court's ultimate disposition of this case.  *See Sound of Mkt. St., Inc. v.*

*Cont'l Bank Int'l*, 819 F.2d 384, 387 (3d Cir. 1987) ("We need not resolve [the choice of law]

issue if the laws of New York and Pennsylvania would not conflict on the resolution of this

dispute."); *see also GTE Corp.*, 372 F.3d at 609 n.8 (finding resolution of choice of law issue

unnecessary where parties do not dispute it and "standard governing contract interpretation is the

same under each of the potentially applicable bodies of law").

Under Pennsylvania law, "[i]n interpreting the language of a contract, [the court]

attempt[s] to ascertain the intent of the parties and give it effect."  *LJL Transp., Inc. v. Pilot Air*

*Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) (quotation and citation omitted).  The court must

derive "the intent of the parties . . . from the language used in the agreement."  *Id.* (quotation and

citation omitted).  In doing so, the court gives the words of the agreement their "commonly

accepted and plain meaning."  *Id.* (quotation and citation omitted).  Finally, the court construes

all provisions of the agreement together and gives effect to each in such a way that, where

possible, no one provision negates or contradicts another.  *See id.* at 647-48.  Practically identical

and the relevant conduct occurred all in that one state.  *See Three Rivers*, 522 F.2d at 892 n.15
(finding Pennsylvania law "clearly" applicable because both agreement signed there and alleged
federal antitrust violations occurred there); *Villanova Univ.*, 123 F. Supp. 2d at 308 (applying
Pennsylvania law to interpret trademark contract made in Pennsylvania by Pennsylvania residents
as related to trademark infringement that occurred in Pennsylvania).  Nor do the parties concede
to the application of the laws of a particular state.  *See GTE Corp. v. Allendale Mut. Ins. Co.*,
372 F.3d 598, 609 n.8 (3d Cir. 2004) (applying New Jersey law because parties did not dispute
its application).

rules of interpretation govern contracts in California[12] and Nevada.[13]

Applying the standards above, the court finds that the agreement did not require plaintiff to join TR as a party to have standing to sue.  The parties appear to dispute the significance of the phrase "acting jointly" as to the rights of plaintiff and TR to "to commence or settle" piracy claims.  (Lic. Agreement ¶ 6.)  The next sentence after this provision states that parties shall "notify each other in writing and shall consult with each other and mutually agree before commencing or settling any [piracy] claim or litigation."  (*Id.*)  Reading the two sentences together, as opposed to in isolation, the court finds that the notification, consultation, and mutual agreement provisions delineate the parties' intention about what constitutes "acting jointly." Noticeably absent from this list is any specific provision that states that for either party to pursue

---

[12]  Summarizing California statutes that govern contract interpretation, the Supreme Court of California in *Powerine Oil Co., Inc. v. Superior Court* explained:

> The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  If contractual language is clear and explicit, it governs.

> . . . Disagreement concerning the meaning of a phrase or the fact that a word or phrase isolated from its context is susceptible of more than one meaning [does not constitute ambiguity].  Language in a contract must be construed in the context of that instrument as a whole.

118 P.3d 589, 597-98 (Cal. 2005) (alterations, quotations, and citations omitted); *see also MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1212-13 (Cal. 2003) (explaining same and citing Cal. Civ. Code §§ 1636, 1638, 1639, 1644 (West 2009)).

[13]  *See Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966) ("Every word must be given effect if at all possible, [and] . . . the court is not at liberty . . . to disregard words used by the parties." (alterations, quotations, and citations omitted)); *Reno Club v. Young Inv. Co.*, 182 P.2d 1011, 1017 (Nev. 1947) (explaining court required to interpret contract "[]consistent with the apparent object of the parties" based solely on "the language employed" by the parties).

a claim it must join the other as a plaintiff.  Therefore, were the court to find the contract requires plaintiff to join TR as a party, the court would infuse the contract with a provision beyond the expressions of the parties, which the court can not do.

The agreement also provides that the parties shall share "[a]ny damages . . . which TR *or* [plaintiff] may recover" from any piracy claim, just as they would any other revenue from the distribution of the broadcast.  (*Id.* (emphasis added).)  By use of the word "or" the agreement ensures that no matter which party—plaintiff or TR—brings a claim for piracy, the parties will treat the damages as if they were gross revenue, of which plaintiff must give a percentage to TR. (Lic. Agreement ¶ 1.)  In other words, whether or not plaintiff joins TR as a party to any piracy litigation, TR has the right to a portion of the recovery.  Moreover, by referring to damages that either TR or plaintiff may recover, the agreement contemplates and provides for each party bringing a piracy claim independent of the other.  Because the agreement makes no express requirement the plaintiff join TR and provides for the sharing of damages for independently pursued piracy claims, the court concludes that "acting jointly" does not mean plaintiff's right to pursue this piracy claim depends on joining TR as a party to this action.  As plaintiff's standing is not contingent on joining TR as a party, defendants are not entitled to judgment as a matter of law for plaintiff's failure to do so.

### b.      Plaintiff's compliance with limitations on standing

Although the contract does not require plaintiff to join TR as a party to have standing, plaintiff can not pursue this action entirely independently.  To that end, defendants argue that plaintiff also failed to comply with the agreement's requirements that plaintiff notify, consult, and agree with TR before pursuing any piracy claim.  Indeed under the agreement plaintiff must

notify TR in writing before bringing this action. (Lic. Agreement ¶ 6.) Moreover, plaintiff must consult and mutually agree with TR. (*Id.*) By use of the word "shall," the agreement expressly ties the "right to commence or settle any claim" with the parties' "acting jointly." In other words, the contract makes standing contingent on joint action, as defined in the agreement. Were the court not to read these words as making such a connection, then the provision would merely restate obvious rights the parties already have: plaintiff could pursue any piracy claim with TR, but not to the exclusion of doing so independently. This reading would make the meaning of "acting jointly" superfluous, and the court can not interpret the agreement this way because the court must give meaning to each provision of the agreement where possible. Thus, the court finds that to have standing to bring this action plaintiff needed to have acted jointly with TR through notification in writing, consultation, and mutual agreement, as the agreement provides.

Turning to whether plaintiff satisfied the "acting jointly" requirement, plaintiff puts forth no evidence that it notified TR in writing before commencing this action. Plaintiff also has not presented any evidence that before commencing this action it consulted with TR or mutually agreed with TR. Similarly, defendants have put forth no evidence that plaintiff *failed* to meet any of these "acting jointly" requirements before commencing this litigation. Therefore, both parties have failed to meet their initial burden to show that no genuine issue of material fact exists as to whether plaintiff met its contractual requirements to have standing to bring this action. Consequently, the court will deny both motions for summary judgment.[14]

---

[14] As a result, the court need not address defendants' argument that because defendants violated its contract with DirecTV, only DirecTV may pursue any piracy claim against defendants. Defendants appear to argue, without citations to any authority, that § 605 applies only to the transmission, but not to the content, of satellite communications. To the contrary, "§ 605 protects both the transmission and its contents." *Eliadis*, 253 F.3d at 915. Moreover, a party

IV.    **Conclusion**

In conclusion, the court finds that for the purposes of this motion there exists no genuine issue of material fact that defendants used reception of satellite transmissions to exhibit the fight in Pitcher's Pub; therefore, plaintiff has set forth a cause of action under § 605, and not § 553. Further, again for the purposes of this motion, there exists no genuine issue of material fact that defendants, in so exhibiting the fight, divulged the fight to unauthorized persons under its agreement with DirecTV and thus in violation of § 605(a).  Although plaintiff has statutory standing to sue as a person aggrieved by defendants' violation of § 605, there remains a genuine issue of material fact as to whether, based on its agreement with TR, plaintiff complied with its contractual obligations to have standing to sue.  Consequently, the court can not conclude that plaintiff is entitled to judgment as a matter of law.  Likewise, based on the arguments and lack of factual evidence offered by defendants, the court cannot conclude that they are entitled to summary judgment.

An appropriate order follows.

_____

with exclusive distribution rights to a broadcast may bring a cause of action against a person who infringes on those distribution rights, even if the violator does so by breaching agreements with another satellite service provider.  *That's Entertainment, Inc.*, 843 F. Supp. at 999.